UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ANGELA OLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:17-cv-10970-KAR |
| | ) | |
| ELAINE L. CHAO, | ) | |
| Secretary of the Department of | ) | |
| Transportation, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56
(Docket No. 75)

ROBERTSON, U.S.M.J.

I.     INTRODUCTION

Plaintiff Angela Olson ("Plaintiff"), an employee of the Federal Aviation Administration

("FAA"), has brought an employment discrimination claim against the defendant Elaine L. Chao,

Secretary of the Department of Transportation ("Defendant").  Plaintiff alleges that Defendant

violated the Rehabilitation Act, 29 U.S.C. § 701 *et seq.,* by illegally discriminating against her on

account of her physical and mental disabilities, denying her reasonable accommodations,

subjecting her to a hostile work environment, and retaliating against her.  Defendant denies

liability and has filed a motion for summary judgment (Dkt. No. 75).  The parties have consented

to this court's jurisdiction.  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.   After hearing the parties'

arguments and considering their written submissions, Defendant's motion is ALLOWED in part

and DENIED in part for the reasons that follow.

II.     BACKGROUND[1]

In 1998, the Veterans' Administration ("VA") deemed Plaintiff, an Army veteran, to be fifty percent disabled based on major depression and the residual effects of the delayed treatment of Lyme disease, including arthralgia, migraine headaches, and fibromyalgia (PSF ¶¶ 8, 9, 10, 152; Dkt. No. 80-2 at 44, 62; Dkt. No. 80-4 at 18-19, Dkt. No. 89 Ex. E). In September 2006, the FAA hired Plaintiff to be an Aviation Safety Inspector ("ASI") for its New England Region Engine and Propeller Directorate, Manufacturing and Inspection Office in Windsor Locks, Connecticut ("MIDO-41") (DSF ¶ 1; PSF ¶ 1). ASIs inspected manufacturers and suppliers of aircraft parts and aviation hardware, provided feedback on quality control data, issued airworthiness certificates for aircraft, investigated quality control or quality system concerns, and met with members of the aviation community and industry representatives to resolve issues and problems (DSF ¶ 2). The ASI position Plaintiff held from September 2006 to July 2011 was a bargaining unit position on the grade (FG) compensation plan with ten steps per grade (DSF ¶ 3; Dkt. No. 68 at 3 ¶¶ 21, 23).

---

[1] Unless another source is cited, the facts are drawn from: Defendant's Statement of Material Facts under L.R. 56.1 (Dkt. No. 64), affidavits in support of Defendant's Statement of Material Facts and attachments (Dkt. Nos. 65-73, 79, 80); Plaintiff's Statement of Material Facts under L.R. 56.1 and Response to Defendant's L.R. 56.1 Statement (Dkt. No. 91) and Exhibits to Plaintiff's Opposition to the Motion for Summary Judgment (Dkt. Nos. 89, 90, 95). The parties also filed: (1) Defendant's Statement of Undisputed Material Facts; Plaintiff's Responses and Statement of Additional Material Facts in Dispute; and Defendant's Responses to Plaintiff's Additional Material Facts ("DSF at ¶ ___"); and (2) Plaintiff's Statement of Material Facts Pursuant to Rule 56.1 and Defendant's Responses ("PSF at ¶ ___") (Dkt. No. 102-1). In accordance with the summary judgment standard, the evidence is viewed in the light most favorable to Plaintiff, the nonmoving party. *See Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991).

Paul Horridge was Plaintiff's direct supervisor at MIDO-41 and Carlos Pestana, the Manufacturing and Inspection Office manager who was based in the regional office in Burlington, Massachusetts, was her second-level supervisor (Dkt. No. 70 at 1 ¶ 3; Dkt. No. 80-2 at 37, 48, 66). [2] In 2009, Plaintiff explained her back condition to Pestana after Horridge directed her to obtain three doctors' notes to support her continued use of a balance ball as a chair to relieve her back and joint pain (PSF ¶ 18; Dkt. No. 80-2 at 48-50, 61; Dkt. No. 89-4 at 4). When Plaintiff applied to attend an eighteen-month leadership development program, she told Pestana she was interested in becoming a manager because she feared that her medical condition – the residual effects of untreated Lyme disease – would prevent her from performing the physical aspects of the ASI position when she was older (Dkt. No. 80-2 at 39, 60-61).

A.   March 2011 to May 2015:  Plaintiff was employed as a Supervisory Aviation Safety Inspector in Burlington, Massachusetts

In March 2011, Plaintiff began serving in a detail (temporary) position as a manager for the FAA's Engine and Propeller Directorate's Manufacturing and Inspection Office in Burlington, Massachusetts ("MIDO-42") (DSF ¶ 6).  Plaintiff's detail was extended on June 19, 2011 (DSF ¶ 7).  Plaintiff alleges that, while she was acting as the manager in Burlington, she informed Pestana that she had difficulty interacting with people and requested a "purposeful way" to interact with others in order to overcome her limitations (Dkt. No. 80-2 at 62-63, 130, 156-57).

On July 3, 2011, Plaintiff was promoted to the non-bargaining unit position of Supervisory Aviation Safety Inspector in the Burlington office (DSF ¶ 8; Dkt. No. 68 at 3 ¶ 21). As a manager, Plaintiff was required to certify products and parts, support the office manager

[2] The regional office oversaw the FAA's field offices in Connecticut, New York, New Jersey, and Pennsylvania (Dkt. No. 80-2 at 66).

with respect to the development of policies and standards for the manufacturing inspection program, and supervise approximately nine employees (DSF ¶ 9). Plaintiff's new position was covered by the tiered Core Compensation Pay Plan (Dkt. No. 68 at 3 ¶ 21). Her salary was in the J-Band tier of annual compensation (DSF ¶ 8; Dkt. No. 68 at 3 ¶¶ 23, 24). Pestana was Plaintiff's first-line supervisor at MIDO-42 (DSF ¶ 13; Dkt. No. 80-2 at 59-60, 129).

In 2011 and 2012, Plaintiff began to supervise and mentor HM, an employee who had a contentious relationship with Pestana and eventually brought claims of disability and race discrimination and retaliation against him (PSF ¶¶ 20, 71; Dkt. No. 89-4 at 4; Dkt. No. 95 Ex. G).[3] Plaintiff's management of HM was stressful and triggered an increase in Plaintiff's depression and anxiety (Dkt. No. 80-2 at 117-19, 130-31; Dkt. No. 89-4 at 4). When Plaintiff cried as she discussed HM with Pestana, he told her to stop crying and criticized her for being unprofessional (PSF ¶¶ 74, 75, 76; Dkt. No. 80-2 at 118-19). Plaintiff explained that she suffered from depression, which was included as a basis for her VA disability rating (Dkt. No. 80-2 at 118-19). Pestana got angry and told Plaintiff to take medication (Dkt. No. 80-2 at 119-20). Thereafter, Plaintiff allegedly told Pestana that she also suffered from anxiety (Dkt. No. 80-2 at 131-32).

Plaintiff was not disciplined, given an unsatisfactory performance review, or placed on an Opportunity to Demonstrate Performance ("ODP") plan during her tenure as a supervisor at the FAA office in Burlington (DSF ¶¶14.3, 20.1, 48.2, 54.1; PSF ¶¶ 7, 61, 154). Pestana's evaluations of Plaintiff's job performance from October 2012 to September 2013 and from October 2013 to September 2014 identified her failure to collaborate with other managers as an area that needed improvement (DSF ¶¶ 19, 20, 21; PSF ¶ 28; Dkt. No. 70 ¶¶ 10, 11; Dkt. No. 70-

_____

[3] HM also sued Plaintiff for discrimination (PSF ¶ 20 [Defendant's response]).

5 at 1; Dkt. No. 70-6 at 1; Dkt. No. 80-2 at 89).[4]  He encouraged her to reach out to MIDO

managers and to the Directorate Management Team ("DMT") for assistance (DSF ¶ 21; Dkt. No.

70-4 at 2; Dkt. No. 80-2 at 84).

Pestana's 2013 and 2014 evaluations also criticized Plaintiff for failing to actively

participate in the hour-long weekly and the longer quarterly management meetings (DSF ¶¶ 19,

20; Dkt. No. 70-5 at 1; Dkt. No. 70-6 at 1; Dkt. No. 80-2 at 65-66, 89).  Plaintiff defended her

lack of participation in the meetings by stating that other managers mocked or criticized her

when she spoke (DSF ¶ 54.2; Dkt. No. 80-2 at 90, 91, 97).  She discussed that issue with Debra

Yawor, a Program and Management Analyst for the FAA who coordinated DMT meetings (DSF

¶ 32).  In addition, because Pestana and others chastised her for taking unpopular positions at

meetings, Pestana eventually prohibited her from discussing topics at DMT meetings unless she

first discussed them with him (DSF ¶ 54.3; Dkt. No. 80-2 at 90-93, 95, 97-98).  That created

what Plaintiff described as a "Catch-22" situation:  she was encouraged to speak at meetings, but

she was prohibited from speaking unless she first cleared her comments with Pestana (Dkt. No.

80-2 at 92-93).  Pestana did not inform Plaintiff that she could be disciplined or reassigned for

her conduct and did not issue her a verbal or written warning for her failure to collaborate with

her colleagues or participate in meetings (DSF ¶¶ 14.5, 14.8, 63.17; PSF ¶ 65).

Shortly before the October 6, 2014 DMT meeting, Pestana told Plaintiff that she did not

get along with anyone, no one liked her, and people complained to him about her (DSF ¶ 31;

PSF ¶ 76; Dkt. No. 80-2 at 107).  At the meeting, Plaintiff confronted her colleagues, asking why

they criticized her behind her back (Dkt. No. 80-2 at 107-08).  Afterward, according to Plaintiff,

---

[4] According to Pestana, it was not unusual for employees to have recommendations in the "Areas
for Improvement" sections of their performance evaluations (DSF ¶ 20.2).

Pestana said, "How dare you [discuss my comments to you]?" while pointing his finger at her face (Dkt. No. 80-2 at 95, 108). She feared that he would touch her (Dkt. No. 80-2 at 95, 108).

On October 29, 2014, Plaintiff asked Pestana for: (1) permission to telework one day per week beginning in February 2015; and (2) specific assignments for DMT meetings that created a purpose and structure to her interactions with her colleagues (hereinafter "the purpose and structure accommodation") (DSF ¶¶ 35, 37; PSF ¶¶ 31, 34, 77, 78; Dkt. No. 89-5 ¶ 12). In support of her telework request, Plaintiff presented Pestana with a doctor's note indicating that she suffered from "chronic headaches related to cervical muscle tension which [was] exacerbated by prolonged periods of . . . driving" and recommending that she be allowed to work from home and that her work station be evaluated by an ergonomic specialist (DSF ¶ 36; PSF ¶ 34). Plaintiff explained that telework would also permit her to attend therapy sessions to stabilize her increased PTSD symptoms and depression (PSF ¶¶ 33, 34; Dkt. No. 89-5 ¶ 9).[5] Plaintiff told Pestana she was requesting the purpose and structure accommodation to alleviate the manifestations of her PTSD and depression, including difficulty with social interactions, anxiety, and a flat affect in unstructured settings, such as DMT meetings (DSF ¶ 14.2; PSF ¶¶ 14, 15, 31; Dkt. No. 89-4 at 5-6; Dkt. No. 89-5 ¶ 12). According to Plaintiff, Pestana responded to the mental health related requests by saying, in a raised voice, "'You tell me you're depressed, then anxiety, now PTSD, what is going to be next Angela? When does this end?'" (PSF ¶ 36). Pestana granted Plaintiff's request to telework beginning in February 2015, but answered Plaintiff's purpose and structure accommodation request by telling her that she needed

---

[5] Although Plaintiff had been diagnosed with PTSD when she served in the military in the early 1990s, she did not have an active PTSD diagnosis when she was promoted to the supervisory position in Burlington in 2011 (Dkt. No. 80-2 at 136-38).

"'training'" (DSF ¶ 39; PSF ¶ 32; Dkt. No. 89-5 ¶ 12).  Plaintiff's accommodation requests were not documented (PSF ¶ 80).

After Plaintiff requested the purpose and structure accommodation, she asked Pestana for detail assignments or opportunities to participate in a specific project on a national team to relieve her depression and anxiety when interacting with her peers (PSF ¶ 79; Dkt. No. 89-4 at 6).  Plaintiff alleges that Pestana called her request "'ridiculous,'" said she was not qualified for those assignments, and did not respond when she asked what steps she could take to qualify (PSF ¶ 79; Dkt. No. 89-4 at 6).

At the February 3-5, 2015 DMT meeting, the other managers allegedly "erupted" when Plaintiff asked a question and she left the room because of anxiety (Dkt. No. 79 at 3; Dkt. No. 80-2 at 162-67).  On February 18, 2015, about two weeks after that DMT meeting, Pestana reprimanded Plaintiff for being late to meetings, for being disrespectful to another manager at a DMT meeting, and for walking out of the February 3-5, 2015 meeting (DSF ¶ 42; Dkt. No. 79 at 1, 3).  Plaintiff alleges that he "yelled," "'How dare you leave the room?'" (PSF ¶ 69).  She explained that she sometimes left to avoid becoming overwhelmed and that she was tardy because she was addressing an issue with one of her employees (PSF ¶ 30; Dkt. No. 79 at 1, 3).  Other managers testified that it was not unusual for managers to arrive late (DSF ¶ 42 [Plaintiff's response citing deposition transcripts]).

Pestana testified that he first discussed Plaintiff's potential reassignment "around February" because he "figured it was time to address the issue" and determine the options (Dkt. No. 89 at 88).  Managers Pestana, Colleen D'Alessandro, Thomas Boudreau, and Diane Romanosky met with Irma Field and April Gauthier of human resources ("HR") and John St. Germaine of labor relations ("LR") on March 2, 2015 to discuss the alternatives that were

available to address the "performance issues" of Plaintiff and CS, a nondisabled employee who Boudreau supervised (PSF ¶¶ 57, 58, 59; Dkt. No. 89 at 140; Dkt. No. 90-1 at 1). D'Alessandro's note of the meeting reflects that Gauthier would "run numbers" of the various options for Pestana (Dkt. No. 90-1 at 1).

Plaintiff alleges that she and Pestana met infrequently after she requested accommodations on October 29, 2014 (PSF ¶ 37). Because Pestana refused to recognize that Plaintiff's PTSD symptoms and depression interfered with her ability to interact and collaborate with her colleagues and, instead, attributed Plaintiff's shortcomings to her alleged deficits in communication skills, he identified a communication course for her on March 3, 2015 (PSF ¶ 28; Dkt. No. 70-13 at 1, 2).

On April 15, 2015, D'Alessandro, Pestana's supervisor, sent an e-mail message to FAA employees Dorenda Baker and Dave Hempe about the "Upcoming ANE Management Transitions" of Plaintiff and CS (Dkt. No. 90 Ex. EE). D'Alessandro indicated that the "moves are based on performance. We've worked closely with HR/LR and Legal to ensure both moves are within Agency policy" (Dkt. No. 90 Ex. EE). The message continued by informing the recipients that early in the week of April 20, Pestana would be reassigning Plaintiff from her management position to a Senior ASI position at MIDO-41 in Enfield, Connecticut (Dkt. No. 90 Ex. EE). The message said, "Angela is unaware of this change – we don't expect her to be happy about it" (Dkt. No. 90 Ex. EE). D'Alessandro's e-mail message also noted that CS would be swapping positions with another employee and said, "If his performance doesn't improve [after the swap], Tom [Boudreau] will likely move [CS] involuntarily out of management similar to what [Pestana] is doing with [Plaintiff]" (Dkt. No. 90 Ex. EE).

Pestana conducted Plaintiff's mid-year performance evaluation on April 21, 2015 (DSF ¶ 47; Dkt. No. 70-15 at 1, 4).[6] He noted her need for improvement in several areas including communicating effectively with other managers, working constructively and collaboratively with the MIO manager (Pestana), the Manufacturing Inspection District Office Management Team ("MIDO MT"), and the DMT, and actively participating during the monthly "ANE-101/MIDO Manager and DMT meetings" (DSF ¶¶ 48, 49; Dkt. No. 70-15 at 4).

When the performance evaluation concluded, Pestana notified Plaintiff that she was being reassigned to MIDO-41 in Connecticut (DSF ¶ 51; PSF ¶ 39). Pestana initially told Plaintiff that he "had lost confidence in her leadership abilities" (DSF ¶¶ 54, 63.1; PSF ¶ 40). When Plaintiff inquired about her right to appeal his decision, Pestana indicated that it was not an adverse action (Dkt. No. 89 at 84; Dkt. No. 89-4 at 9). Instead, he called it "'just a reassignment of work'" (DSF ¶ 63.2; Dkt. No. 89-4 at 9). Two days later, on April 23, 2015, Pestana sent Yawor the "first draft" of an e-mail message to colleagues indicating that Plaintiff's reassignment to Enfield, Connecticut was part of an "organizational restructure" (PSF ¶ 45). However, Pestana knew that his representation was false (DSF ¶ 63.8 # 2; PSF ¶¶ 46, 47). Pestana later told Plaintiff that the reassignment was an attempt to make her "'happy,'" and was meant to address her medical conditions (DSF ¶¶ 63.4, 63.5; PSF ¶¶ 42, 43). Pestana's deposition testimony indicates that Plaintiff's reassignment was conduct related, not performance related (DSF ¶ 63.16; PSF ¶ 64), whereas D'Alessandro testified that she thought the reassignment was performance related (DSF ¶ 63.18; PSF ¶ 66).

[6] Defendant references Ex. 16 as support for this fact (DSF ¶ 47). However, the April 21, 2015 performance evaluation is Ex. 15 (Dkt. No. 70-15 at 1).

Plaintiff had no notice that she would be reassigned before Pestana told her on April 21, 2015 (DSF ¶ 63.13; PSF ¶ 52). At that time, she did not tell Pestana that her physical condition would make it difficult for her to perform the duties of an ASI (DSF ¶¶ 53, 65, 66, 67; Dkt. No. 80-2 at 179). According to Plaintiff, Pestana asked her if she had anything to say, but indicated that whatever she said would not matter (Dkt. No. 80-2 at 180-81). About ten days later, when Plaintiff tried to tell Pestana that her physical condition would prevent her from performing the ASI job, which required inspecting aircraft and performing audits of the manufacturing process, Pestana allegedly refused to discuss it (DSF ¶ 67.1; PSF ¶¶ 81, 82, 83, 84, 90).[7]

On Plaintiff's last day in the Burlington office, she intended to complain to D'Alessandro, her second-level supervisor, about the reassignment, but D'Alessandro rebuffed her attempt (DSF ¶ 13, 63.10; PSF ¶ 50; Dkt. No. 80-2 at 182). D'Alessandro told Plaintiff that the personnel action "had been 'discussed for a long time by a lot of people'" (DSF ¶¶ 63.11, 63.12; PSF ¶¶ 51, 55). D'Alessandro refused to provide Plaintiff with additional information concerning those discussions notwithstanding Plaintiff's request (DSF ¶ 63.13; PSF ¶ 52).

---

[7] The job description's physical demands were as follows:

> Work is normally sedentary but does require regular and recurring bending, crouching, stooping, stretching, reaching, crawling and squeezing into tight places; occasionally carrying/loading light material, or similar activities when witnessing or evaluating production and quality management systems.

(PSF ¶ 83).

The work environment for the position, in pertinent part, was described as follows:

> The work requires the use of protective or safety equipment to minimize the effects of [moderate discomforts] and unpleasant environments.

(PSF ¶ 84).

On May 13, 2015, Plaintiff received an SF-50, Notice of Personnel Action form (DSF ¶ 63.14; PSF ¶ 53; Dkt. No. 68-1 at 1). The notice indicated that Plaintiff's reassignment to Senior Aviation Safety Inspector, a nonmanagerial bargaining unit position on the grade (FG) compensation plan, was a "competitive action" (DSF ¶ 63.14, 71; PSF ¶¶ 39, 53; Dkt. No. 68-1 at 1). Plaintiff, however, did not apply or compete for the position (DSF ¶ 63.14; PSF ¶ 54). Plaintiff's salary increased by $3,175 after the reassignment (DSF ¶ 72). It is undisputed that the FAA did not provide a right to file a grievance or to appeal the reassignment (DSF 63.15; PSF ¶ 54).[8]

B.    <u>May 3, 2015: Plaintiff began working as a Senior Aviation Safety Inspector in Enfield, Connecticut</u>

After Plaintiff reported to work at MIDO-41 in Connecticut on May 3, 2015, she met with Eileen Murphy, the J-Band Senior Aviation Safety Inspector, to discuss her responsibilities (DSF ¶ 74). Plaintiff's concerns about the reassignment prompted Murphy to schedule a meeting with Richard Warren, their first-line supervisor (DSF ¶¶ 75, 76; PSF ¶¶ 93, 94).

Plaintiff met with Warren and Murphy on May 12, 2015 (DSF ¶ 76; PSF ¶ 96). According to Murphy's notes of the meeting,[9] Plaintiff described her conditions that were diagnosed in 1991 and informed Warren and Murphy that she had a ten point veterans' preference, used a ball as a chair to relieve her back pain, and had received permission to

_____

[8] Plaintiff alleges that, in May 2015, Pestana represented that she was being converted to a Grade 14 position and could not remain on the J-Band pay scale because each Manufacturing and Inspection office could have only one J-Band ASI (PSF ¶ 149; Dkt. No. 89-20 at 31 [indicating the date was May 3, 2015]). Plaintiff claims that she subsequently learned that this was incorrect and that some offices had multiple Senior Aviation Safety Inspectors with J-Band status (Dkt. No. 89-20 at 31).

[9] Plaintiff reviewed and edited Murphy's notes before they were finalized and initialed the final version of the notes (DSF ¶¶ 78, 79).

telework as a reasonable accommodation (PSF ¶ 98; Dkt. No. 89-15 at 2). Plaintiff was apprehensive about her ability to stand and walk as much as the Senior ASI job required (PSF ¶ 97; Dkt. No. 89-15 at 2). She also worried about her potential inability to drive back to the office or home from an assignment because of the affects of the prescription drugs she took to manage her conditions (PSF ¶ 97; Dkt. No. 89-15 at 2). Warren asked if she had considered disability retirement (Dkt. No. 89-15 at 2). Plaintiff indicated that she received disability benefits from the military (Dkt. No. 89-15 at 2). Warren told Plaintiff that she would not be assigned as the Principal Inspector on projects and Murphy would assist her in supporting the ASIs (Dkt. No. 89-15 at 2). Following the meeting, Murphy assigned Plaintiff to work at facilities near her home and office and more administrative work (DSF ¶ 81).

On July 17, 2015, Plaintiff asked Warren for the following accommodations: (1) thirty days of leave beginning on July 20, 2015; (2) assignments that avoided bending, twisting, stretching, squatting, crouching, crawling, reaching, or entering confined spaces; (3) assignments that did not require her to stand or sit for more than ten minutes at a time; (4) assignments that did not require her to drive more than twenty minutes; (5) a plan for a procedure to follow if her migraine headaches or medication rendered her unable to drive; and (6) the ability to telework at least three days per week (DSF ¶ 85; PSF ¶ 100; Dkt. No. 80-4 at 16). Plaintiff submitted documents to support her request, including a July 16, 2015 letter from a doctor describing Plaintiff's PTSD symptoms -- panic attacks, anxiety, feelings of being unsafe, flashbacks, trouble concentrating and focusing, depressed mood, and poor sleep -- and recommending a thirty day leave for self-care and treatment (DSF ¶ 86; PSF ¶ 101; Dkt. No. 80-4 at 17-21). Murphy, who was the acting manager when Plaintiff submitted her requests, immediately granted Plaintiff a thirty-day leave (DSF ¶ 87).

In response to Warren's July 23, 2015 letter requesting documentation regarding Plaintiff's medical condition as it related to the essential functions of the Senior ASI position, Plaintiff submitted Nicole Tan Kirchen, M.D.'s August 4, 2015 letter indicating Plaintiff's limitations and opining that she should have either an exclusively administrative job or the option to telework part-time (DSF ¶¶ 88, 89; PSF ¶ 153; Dkt. No. 80-4 at 31-32). Warren convened a panel to consider Plaintiff's accommodation requests that had not already been granted (DSF ¶ 90).

By a September 14, 2015 letter, Warren informed Plaintiff that because the FAA could not provide an accommodation that would enable her to perform the essential functions of the ASI job, he would start the job reassignment process by searching for a vacant funded position at the same or lower level as her current position (DSF ¶ 93; PSF ¶ 102). Warren provided Plaintiff with a questionnaire to complete concerning the jobs she would and would not accept (DSF ¶ 94; PSF ¶ 103). Plaintiff was advised that "narrowing the search too much could result in very limited or no positions being identified for possible reassignment and could result in [her] separation from Federal service" (DSF ¶ 94; PSF ¶ 103). Plaintiff claims that, on September 22, Warren told her that he was uncomfortable with the September 14 decision and that he would attempt to make things work (PSF ¶ 104). [10]

---

[10] Plaintiff filed an informal complaint with the FAA Civil Rights Office on May 10, 2015 claiming disability discrimination based on her reassignment and her request for reasonable accommodations (Dkt. No. 89-5 ¶ 25; Dkt. No. 89-18 at 16). Plaintiff received a notice of the right to file an administrative complaint on August 3, 2015 (DSF ¶ 91). She filed an administrative complaint ("EEO Complaint # 1") on August 18, 2015 (DSF ¶ 92). The following three issues were accepted for investigation: (1) whether the FAA discriminated against Plaintiff based on her disabilities by reassigning her from Massachusetts to Connecticut; (2) whether the FAA subjected her to a hostile work environment between October 2014 and September 2015 by harassing her because of her disabilities; and (3) whether the FAA retaliated against her in September 2015 by deciding that she could not be accommodated in her position of Senior ASI and beginning the reassignment process (DSF ¶ 102; Dkt. No. 72 at 2 ¶ 8). The FAA's

On September 28, 2015, Plaintiff requested reconsideration of Warren's decision (DSF ¶ 95). In pertinent part, her letter asked for reassignment to a Certification Specialist position, which was "largely, if not entirely, administrative in nature" (DSF ¶ 95).

On February 2, 2016, Warren notified Plaintiff that the Certification Specialist position she had requested would be available in MIDO-41 on March 4, 2016 and that Plaintiff "could be reasonably accommodated through reassignment [to that position] at [her] current grade and pay" (DSF ¶¶ 113, 115; PSF ¶¶ 106, 107). In addition, Warren granted Plaintiff's requests to telework three days a week and to get prescription safety glasses (DSF ¶ 114). At a February 8, 2016 conference with Plaintiff and Murphy, Warren outlined the accommodations for the Certification Specialist position, including the plan for responding to Plaintiff's inability to drive due to migraines or medication (DSF ¶ 116; Dkt. No. 80-4 at 47-48). After Plaintiff expressed concerns about the proposed plan addressing her possible inability to drive and suggested an alternative, Warren agreed to her proposal (DSF ¶ 117; Dkt. No. 80-4 at 49).

C.     October 2015 to August 2016:  Plaintiff Applied for Management Positions

While Plaintiff's request for reconsideration of Warren's September 14, 2015 decision was pending, she submitted applications for the following four FAA management positions:  a J-Band position in Orlando, Florida; her former J-Band position in Burlington (MIDO-42); a K-Band Supervisory Aviation Safety Inspector position in Enfield, Connecticut (MIDO-41) where she was working as a Senior ASI; and a ninety day detail supervisory position in the office that served Farmingdale, New York and Saddlebrook, New Jersey (DSF ¶¶ 97, 98, 119, 128; PSF ¶¶

investigation of EEO Complaint # 1 concluded on November 8, 2015 (DSF ¶ 103). The parties' filings do not disclose the outcome of the FAA's investigation.

109, 114, 127, 128, 130). Plaintiff was not selected to fill any of the positions (DSF ¶¶ 98, 109, 121, 129; PSF ¶ 110, 121, 128, 136, 137).[11] [12]

### III. STANDARD OF REVIEW

"Summary judgment is proper where 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (quoting Fed. R. Civ. P. 56(c)). "A factual dispute is 'genuine' if 'it may reasonably be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir. 1990)). "[A] fact is 'material' 'if its existence or nonexistence has the potential to change the outcome of the suit.'" *Jarvis v. Village Gun Shop,*

---

[11] Plaintiff contacted an EEO counselor on January 8, 2016 and received notice of a right to file an administrative complaint on January 22, 2016 (DSF ¶¶ 105, 107). She filed her second administrative complaint ("EEO Complaint # 2") on February 2, 2016 (DSF ¶ 111). The following issues were accepted for investigation: (1) whether Plaintiff was the subject of discrimination or retaliation when she was not selected for an interview for the Orlando position and was not selected for the Burlington position; and (2) whether Plaintiff was subject to a hostile work environment because of her disabilities and protected activity in Connecticut (DSF ¶ 112). The investigation concluded on July 27, 2016 (DSF ¶ 133). Again, the parties have not notified the court of the outcome of the investigation.

[12] Plaintiff contacted an EEO counselor on September 14, 2016 (DSF ¶ 134). On October 17, 2016, Plaintiff received a notice of a right to file an administrative complaint (DSF ¶ 135). Plaintiff filed her third administrative complaint ("EEO Complaint # 3") on October 28, 2016 (DSF ¶ 136). The following issues were accepted for investigation: (1) whether Plaintiff was discriminated or retaliated against because of her disability when she was not selected for the detail position or the K-Band management position in Connecticut; and (2) whether Plaintiff was subjected to a discriminatory or retaliatory hostile work environment (DSF ¶ 137). The investigation of Complaint # 3 ended on April 17, 2017 (DSF ¶ 139). The outcome of the investigation is not disclosed.

*Inc.*, 805 F.3d 1, 7 (1st Cir. 2015) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).

In ruling on summary judgment, the court "view[s] 'the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor.'" *Euromotion, Inc. v. BMW of N. Am., Inc.*, 136 F.3d 866, 869 (1st Cir. 1998) (quoting *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990)). "A party seeking summary judgment is responsible for identifying those portions of the record, 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Massacani v. Kelly Servs., Inc.*, Civil Action No. 3:16-cv-30069-KAR, 2018 WL 443448, at *1 (D. Mass. Jan. 16, 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant can meet this burden "either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting *Celotex*, 477 U.S. at 325). If the moving party meets its burden, "'the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Carroll*, 294 F.3d at 236). "'[T]he nonmoving party 'may not rest upon mere allegations or denials of [the movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s]he would bear the ultimate burden of proof at trial.'" *Id.* (third alteration in original) (quoting *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997)). "'The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."'" *Id.* at 152-53 (quoting *DeNovellis*, 124 F.3d at 306).

IV.     ANALYSIS

Plaintiff alleges that Defendant violated the Rehabilitation Act by: (1) reassigning her from the supervisory J-Band position in Burlington to the nonsupervisory bargaining unit position in Connecticut; (2) failing to grant or inordinately delaying her requests for reasonable accommodations; and (3) failing to hire her for any of the four positions for which she applied while awaiting Warren's decision on her request for reconsideration. Plaintiff claims that those actions constituted disability discrimination and a failure to accommodate (Counts I and II), created a hostile work environment (Count III), and were retaliatory (Count IV) (Dkt. No. 1). [13]

A.     Count I: Disability Discrimination by Adverse Employment Actions

Plaintiff's disability discrimination claim in Count I is based on a series of discrete events that involved different decision-makers. She relies on her reassignment from the supervisory J-Band position in Burlington to the nonsupervisory FG-14 position in Connecticut in April 2015 and her non-selection for the K-Band Supervisory Aviation Safety Inspector position in Connecticut and the detail position in the New York and New Jersey office (Dkt. No. 1 ¶ 114 (e), (h), (i)). According to Plaintiff, these adverse actions were taken because of her disability.

"The Rehabilitation Act prohibits the [FAA] from discriminating against its employees on the basis of disability." *Bangura v. Shulkin*, 334 F. Supp. 3d 443, 461 (D. Mass. 2018). *See* 29 U.S.C. § 701 *et seq.* Because Plaintiff does not provide direct evidence of disability discrimination, Plaintiff's claim is subject to the "three-stage burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)." *Boadi v. Ctr. for Human Dev., Inc.*, 239 F. Supp. 3d 333, 349-50 (D. Mass. 2017) (quoting *Acevedo-Parrilla v. Novartis*

---

[13] Because "the case law construing the [Americans with Disabilities Act ("ADA")] generally pertains equally to claims under the Rehabilitation Act," the court's analysis references cases addressing both laws. *Calero-Cerezo v. U.S. Dept. of Justice,* 355 F.3d 6, 11 n.1 (1st Cir. 2004). *See Oliveras-Sifre v. P.R. Dep't of Health,* 214 F.3d 23, 25 n.2 (1st Cir. 2000).

*Ex-Lax, Inc.,* 696 F.3d 128, 138 (1st Cir. 2012)). *See Moebius v. Tharperobbins Co.,* CIVIL

ACTION NO. 15-10751-MBB, 2016 WL 6476941, at *8 (D. Mass. Nov. 1, 2016).

Plaintiff has the initial burden to establish a prima facie case. *See McDonnell Douglas*

*Corp.*, 411 U.S. at 802. "To make out a prima facie case of disability discrimination, the

Plaintiff must prove by a preponderance of the evidence that: (1) she was disabled within the

meaning of the statute; (2) she was qualified to perform the essential functions of her job, either

with or without a reasonable accommodation; and (3) that the [FAA] took adverse action against

her because of her disability." *Bangura,* 334 F. Supp. 3d at 461 (citing *Rios-Jimenez v. Principi*,

520 F.3d 31, 41 (1st Cir. 2008)). "The rather minimal showing functions to raise an inference of

discrimination." *Moebius*, 2016 WL 6476941, at *8 (citing *Tex. Dep't of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248, 253-54 (1981)).

"If Plaintiff establishes the inference, the burden shifts to Defendant[ ] 'to articulate a

legitimate, non-discriminatory reason for its action.'" *Boadi,* 239 F. Supp. 3d at 350 (quoting

*Ramos–Echevarría v. Pichis, Inc.*, 659 F.3d 182, 186-87 (1st Cir. 2011) (citing *Freadman v.*

*Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 99 (1st Cir. 2007)); *see also McDonnell Douglas*

*Corp.*, 411 U.S. at 802. "If the employer offers a non-discriminatory reason, the burden then

shifts back to the plaintiff to show that the employer's justification is mere pretext cloaking

discriminatory animus." *Ramos–Echevarría*, 659 F.3d at 187 (citing *Freadman*, 484 F.3d at 99).

  1. Whether Plaintiff's reassignment from Burlington, Massachusetts to
    Enfield, Connecticut in April 2015 was discriminatory presents a genuine
    question of material fact.

    (a) Plaintiff established a prima facie case of discrimination

Contending that the physician's note that Plaintiff presented to Pestana on October 29,

2014 recommending that she decrease her driving time to relieve chronic headaches was

insufficient for this purpose, Defendant claims that Plaintiff has not shown evidence of disability

when she was reassigned to Connecticut in April 2015 (Dkt. No. 78 at 9).  Defendant's

contention, however, ignores Plaintiff's evidence that she also told Pestana that she suffered from

PTSD, the residual effects of the delayed treatment of Lyme disease, depression, and anxiety.

The Rehabilitation Act defines "disability" as either "(a) a physical or mental impairment

which substantially limits one or more of an individual's major life activities; (b) a record of such

impairment; or (c) being regarded as having such an impairment."  *Calero-Cerezo*, 355 F.3d at

20 (citing 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g)).  Plaintiff claims, under subsection (a),

to have physical and mental impairments that substantially limited her ability to work and, under

subsection (b), a record of such impairments (Dkt. No. 88 at 25-27).  Plaintiff has met her burden

of establishing that she suffered physical and mental impairments, and the impairments

substantially limited her ability to work, which is a "major life activity."  *See Calero-Cerezo,* 355

F.3d at 20.[14]

In 1998, the VA based Plaintiff's fifty percent disability rating on the residuals of Lyme

disease, including fibromyalgia, migraine headaches, and major depression (Dkt. No. 89 Ex. E).

About three months after Plaintiff was reassigned to Connecticut, she submitted Dr. Kirchen's

letter indicating that she was being treated for "chronic migraines, arthritis in the hips, knees and

feet, [f]ibromyalgia, and chronic [PTSD]" (Dkt. No. 89 Ex. BB). [15]  Fibromyalgia, major

---

[14] Because Plaintiff has established disability under subsection (a), there is no need to discuss the
subsection (b) alternative.

[15] Contrary to Defendant's contention that Plaintiff failed to provide medical evidence that
"linked her mental health issues to her [in]ability to communicate," the record contains the VA's
rating decision indicating that an evaluation of fifty percent disabled is assigned for
"occupational and social impairment with reduced reliability and productivity due to such
symptoms as:  flattened affect; . . . [and] difficulty establishing and maintaining effective work
and social relationships" (Dkt. No. 89 Ex. E).  Plaintiff was given a fifty percent disability rating

depression, and PTSD have been recognized as mental impairments under the Rehabilitation Act and the ADA. *See Beadle v. Postal*, Civ. No. 17-00049 JMS-KSC, 2017 WL 1731683, at *3 n.4 (D. Haw. May 2, 2017) ("PTSD is a recognized mental impairment that substantially limits brain function.") (citing 29 C.F.R. § 1630.2(j)(3)(iii)); *Thomas v. S.F. Hous. Auth.*, No. 3:16-cv-03819, 2017 WL 878064, at *8 (N.D. Cal. Mar. 6, 2017) (PTSD constitutes a plausible disability for purposes of the ADA); *Harding v. Cianbro Corp.*, 436 F. Supp. 2d 153, 172 (D. Me. 2006) ("Other courts have . . . found fibromyalgia to be a physical impairment.") (collecting cases); *Tebo v. Potter*, 345 F. Supp. 2d 61, 66 (D. Mass. 2004) ("The First Circuit has recognized that major depression can qualify as a mental impairment within the meaning of the Rehabilitation Act.") (citing *Calero–Cerezo,* 355 F.3d at 20).

Plaintiff identifies working as the major life activity with which her mental impairments interfered at the time of her reassignment in April 2015. *See* 29 U.S.C. § 794(d) (the Rehabilitation Act applies the ADA standards, as amended by the ADA Amendment Act of 2008, including 42 U.S.C. § 12102, to federal employers); 42 U.S.C. § 12102(2)(A) (under the ADA, "major life activities" include working). As a Supervisory ASI, Plaintiff was required to collaborate with the office manager to develop policies and programs and to network with other managers (DSF ¶¶ 9, 15, 16, 17). Plaintiff alleges that her mental impairments, particularly PTSD, limited her ability to interact with her colleagues, thereby impairing her ability to perform

---

in February 1998 (Dkt. No. 89 Ex. E). In addition, on July 16, 2015, about three months after Plaintiff was reassigned to Connecticut, Christie Clovis, LICSW, stated that Plaintiff suffered from PTSD and depression and experienced symptoms including panic attacks and anxiety (Dkt. No. 89 Ex. F). On August 4, 2015, Dr. Kirchen indicated that Plaintiff suffered from "chronic" PTSD (Dkt. No. 89 Ex. BB)

those aspects of the job (DSF ¶ 14.2; PSF ¶¶ 14, 15).[16]  While Defendant points to some statements by Plaintiff suggesting that her deficits were not caused by her disability but, instead, were manifestations of her "personality" (DSF ¶¶ 34, 44; Dkt. No. 78 at 10), the dispute about whether or not Plaintiff's mental health limited her ability to work cannot be resolved on summary judgment.  *See Calero-Cerezo,* 355 F.3d at 13 ("a reasonable factfinder might conclude that [plaintiff's] friction with her supervisor (and . . . others including family and friends) *might* be explained on the ground that she was simply a very difficult, not a disabled, person.  In the context of summary judgment, however, we must respect the role of the factfinder to choose between alternative, reasonably supported inferences.").

Further, Plaintiff established that her impairments substantially limited her ability to work.  A "substantial limitation" is one that is "'considerable' or 'specified to a large degree.'" *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 491 (1999).  Plaintiff's limitations with respect to significant aspects of her job -- communication and collaboration with Pestana and other managers -- was a substantial limitation notwithstanding her ability to carry out other functions, including supervising her team.  *See Calero-Cerezo,* 355 F.3d at 22 ("An impairment can substantially limit a major life activity, even though the plaintiff is still able to engage in the activity to some extent.") (citing *Gillen v. Fallon Ambulance Serv., Inc.,* 283 F.3d 11, 22 (1st Cir. 2002)).

For purposes of summary judgment, Defendant does not challenge Plaintiff's ability to perform the essential functions of her jobs with or without accommodations (Dkt. No. 78 at 9-10).

---

[16] The July 16, 2015 letter from Plaintiff's therapist indicates that, at that time, Plaintiff's PTSD symptoms included anxiety, panic attacks, trouble concentrating and focusing, and a depressed mood (Dkt. No. 89 Ex. F).

The parties dispute the state of Pestana's knowledge of Plaintiff's disability when he reassigned her to Connecticut in April 2015. [17] According to Defendant, because Pestana was unaware that Plaintiff was disabled at that time, he did not discriminate against her based on a disability. Plaintiff has presented sufficient evidence to establish a genuine factual dispute concerning Pestana's awareness of her disability that cannot be resolved by summary judgment. *See Bailey v. Ga.-Pac. Corp.,* 306 F.3d 1162, 1166 (1st Cir. 2002).

"Many courts have determined that a plaintiff cannot sustain a *prima facie* case of disability discrimination without showing that an employer had actual or constructive knowledge of the plaintiff's disability." *Rivera Concepcion v. Puerto Rico,* 682 F. Supp. 2d 164, 174–75 (D.P.R. 2010) (citing *Hedberg v. Ind. Bell Tel. Co.,* 47 F.3d 928, 932 (7th Cir. 1995)). "[E]mployers can become aware of an employee's condition indirectly, such as through observation of the employee's behavior, a third party's report, or the employee's description of his or her condition." *Boadi*, 239 F. Supp. 3d at 351. *See Alejandro v. ST Micro Electrs., Inc.*, 129 F. Supp. 3d 898, 909 (N.D. Cal. 2015).

---

[17] Notwithstanding Defendant's agreement that Plaintiff's reassignment to Connecticut was an adverse employment action for purposes of her prima facie case on summary judgment (Dkt. No. 78 at 10-11), Defendant's reply brief argues that, based on her salary increase, Plaintiff's reassignment was not a demotion and, thus, was not an adverse action (Dkt. No. 97 at 8-9). The court disagrees. "'Title VII does not limit adverse job action to strictly monetary considerations.'" *Marrero v. Goya of P. R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002) (quoting *Collins v. Illinois,* 830 F.2d 692, 703 (7th Cir. 1987)). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). As a Senior ASI in Connecticut, Plaintiff no longer had the same supervisory responsibilities she had in Burlington and she claims that the reassignment limited her opportunities for promotion. Plaintiff has adequately alleged an adverse employment action. *See Blackie v. Maine,* 75 F.3d 716, 725 (1st Cir. 1996).

When Pestana reassigned Plaintiff in April 2015, he was aware that she used a balance ball for a medical condition, had "chronic headaches related to cervical muscle tension," which limited her ability to drive, and suffered from depression, but claims that he did not know about Plaintiff's physical impairments due to the delayed treatment of Lyme disease, or that Plaintiff suffered from PTSD (PSF ¶¶ 18, 19, 27; Dkt. No. 70-1 at 2; Dkt. No. 89 at 83, 92-93; Dkt. No. 89 Ex. CC). However, Plaintiff alleges that she told him about her physical condition before 2011 and about her mental health conditions at various times (DSF ¶ 14.2; PSF ¶ 33; Dkt. No. 80-2 at 60-64; Dkt. No. 89-4 at 4-6; Dkt. No. 89-5 ¶ 12; Dkt. No. 90 at 1 n.2). She purportedly told Pestana that she suffered from PTSD on October 29, 2014 when she requested the telework accommodation in order to attend therapy appointments and the purpose and structure accommodation to address her difficulty communicating and interacting with her colleagues, which stemmed from PTSD and depression (PSF ¶¶ 33, 34; Dkt. No. 90 at 1-2 & n.2). *See Alejandro,* 129 F. Supp. 3d at 909-10 (plaintiff alleged that his supervisor knew about his disability because he told him about "'his conditions, their effects on him, the fact that he was undergoing treatment, and the need for accommodation in the form of occasional temporary time off and/or work from home.'"); *Hammon v. D.H.L. Airways, Inc.*, 980 F. Supp. 919, 926 (S.D. Ohio 1997), *aff'd*, 165 F.3d 441 (6th Cir. 1999) ("An employer 'knows' of a disability when an employee tells the employer of . . . her 'condition.'").

Where there is conflicting evidence concerning Pestana's knowledge of Plaintiff's disabilities, she has successfully established knowledge for purposes of summary judgment.

       (b)    Defendant demonstrated that it had a legitimate, nondiscriminatory reason for Plaintiff's reassignment.

Defendant has sustained the burden to produce evidence of a legitimate, nondiscriminatory reason for Plaintiff's reassignment. *See St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 506-07 (1993); *Burdine,* 450 U.S. at 253. Pestana claimed that he reassigned Plaintiff because he "lost confidence in her leadership abilities" (DSF ¶ 54; Dkt. No. 70-1 at 3-5). He and D'Alessandro attributed Plaintiff's reassignment to her isolation from other members of the management team (DSF ¶¶ 54, 55; Dkt. No. 70-1 at 5). Specifically, Pestana and D'Alessandro indicated that Plaintiff failed to comply with the FAA's Risk Based Decision Making Methodology, to work collaboratively and constructively with Pestana, the MIDO MT, and the DMT, and to seek assistance from other managers (DSF ¶¶ 54, 55, 58, 59). According to D'Alessandro and Pestana, Plaintiff was the only manager who made decisions without consulting Pestana or other management team members (DSF ¶ 58; Dkt. No. 70-1 at 6). D'Alessandro, J-Band manager Elizabeth Campbell, and Yawor described Plaintiff's inappropriate behavior and lack of interaction with her peers at management meetings (DSF ¶¶ 57, 59, 60, 61). Plaintiff's colleagues described her as being "disrespectful," "combative," and "very abrasive" (DSF ¶ 56; Dkt. No. 73-1 at 3). In other words, Plaintiff's supervisors and peers alleged that her lone wolf behavior was not compatible with her management responsibilities.

      (c)      Plaintiff's evidence showed that Defendant's proffered reasons for her reassignment could be pretextual.

Because Defendant has provided a legitimate, nondiscriminatory reason for Plaintiff's reassignment, the burden shifts back to Plaintiff to point to evidence from which a factfinder could infer discrimination. *See Griel v. Franklin Med. Ctr.*, 71 F. Supp. 2d 1, 10 (D. Mass. 1999), *aff'd,* 234 F.3d 731 (1st Cir. 2000). "[P]laintiff must 'produce evidence to create a genuine issue of fact with respect to two points: [1] whether the employer's articulated [nondiscriminatory] reason for its adverse action was a pretext and [2] whether the real reason was [handicap] discrimination.'" *Id.* at 11 (alterations in original) (quoting *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 62 (1st Cir. 1999)). "In other words, [Plaintiff] must 'elucidate specific

facts which would enable a [factfinder] to find the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination.'" *Ray v. Ropes & Gray LLP,* 799 F.3d 99, 113 (1st Cir. 2015) (quoting *Azimi v. Jordan's Meats, Inc.,* 456 F.3d 228, 246 (1st Cir. 2006)).  "Plaintiffs may use the same evidence to support both conclusions, provided that the evidence is adequate to enable a rational factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action." *Thomas,* 183 F.3d at 57 (internal quotations and citations omitted).  "[T]he First Circuit warns that courts must be '"particularly cautious" in granting summary judgment on a discrimination claim when the case boils down to whether the employer's stated reasons are pretextual.'" *Medina v. Adecco*, 561 F. Supp. 2d 162, 170 (D.P.R. 2008) (quoting *Kosereis v. Rhode Island,* 331 F.3d 207, 216 (1st Cir. 2003)).  *See also Billings v. Town of Grafton,* 515 F.3d 39, 56 (1st Cir. 2008) (denying summary judgment due to factual disputes regarding the motivation behind an adverse employment action); *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 54 (1st Cir. 2000) ("[C]ourts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent.").

"Plaintiffs can show that an employer's stated reasons are pretextual in any number of ways." *Kosereis*, 331 F.3d at 214.  Here, Plaintiff has presented evidence of four grounds from which a factfinder could reasonably infer that Defendant's proffered reasons for her reassignment were a pretext designed to conceal disability discrimination.  First, Plaintiff argues that her consistently positive performance evaluations permit a reasonable inference of pretext, particularly in view of D'Alessandro's stated belief that Plaintiff's performance was the basis for her reassignment (Dkt. No. 90 Ex. EE).  "An employee's strong record with an employer as reflected in performance reviews and pay increases may be evidence of pretext when an

employer later claims that the employee was [transferred] for poor performance." *Roussin v. Covidien LP*, Civil No. 13-12539-FDS, 2016 WL 393182, at *7 (D. Mass. Feb. 1, 2016) (citing *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2002)). There is no dispute that Plaintiff met expectations for all of her performance evaluations and was never disciplined or given an ODP plan (DSF ¶¶ 14.3, 20.1; PSF ¶¶ 7, 61, 154). *See Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 421 (1st Cir. 2017) ("evidence of overall positive employment reviews may be used to establish pretext when an employee is later terminated for poor performance"); *Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 137 n.23 (1st Cir. 2017) (same); *Collazo v. Bristol-Myers Squibb Mfg., Inc.*, 617 F.3d 39, 52-53 (1st Cir. 2010) (considering evidence of employee's positive work evaluations and concluding that a genuine issue of material fact existed as to whether the performance-related justification was pretextual).

Next, Plaintiff points to the conflicting reasons Pestana proffered for her reassignment. *See Billings,* 515 F.3d at 56 ("An employer's 'different and arguably inconsistent explanations' for its challenged employment action can serve as evidence of pretext") (quoting *Domínguez–Cruz,* 202 F.3d at 432). Pestana's justifications shifted from his loss of confidence in Plaintiff's leadership abilities, to "'just a reassignment of work,'" to an attempt to make her happy, to a way to address her medical condition (DSF ¶ 54, 63.1, 63.2, 63.4, 63.5; PSF ¶ 40; Dkt. No. 89 at 86; Dkt. No. 89-4 at 9). His claim that Plaintiff's conduct justified her reassignment is, arguably, inconsistent with D'Alessandro's statement that it was related to Plaintiff's performance (Dkt. No. 90 Ex. EE). *See Soto-Feliciano v. Villa Cofresí Hotels, Inc.,* 779 F.3d 19, 32 (1st Cir. 2015) ("the incongruities in the defendants' account of their misconduct-based reasons for firing [plaintiff] could give rise to an inference of pretext"). Moreover, because "[pretext] means deceit — a lie — to cover one's tracks," *Echevarria v. AstraZeneca, LP*, 133 F. Supp. 3d 372, 403

(D.P.R. 2015), *aff'd*, 856 F.3d 119 (citing *Ronda–Pérez v. Banco Bilbao Argentaria–P. R.,* 404 F.3d 42, 45 (1st Cir. 2005)), Pestana's proposal to lie to his colleagues by notifying them that Plaintiff's reassignment was part of an "organizational restructure" may be probative of pretext and, by inference, discrimination (DSF ¶ 63.8 # 2; PSF ¶¶ 45, 46, 47). Plaintiff has met her burden of "show[ing] that [her] employer did not honestly believe in the accuracy of the reason given for the action at issue." *Echevarria,* 133 F. Supp. 3d at 403.

Third, Plaintiff cites Pestana's failure to follow the FAA's procedures for disciplining employees who have conduct or performance issues. A "'failure to follow established procedures or criteria' is sufficient to support a reasonable inference of intentional discrimination." *Nesbitt v. Holder,* 966 F. Supp. 2d 52, 56 (D.D.C. 2013) (quoting *Brady v. Office of the Sergeant at Arms,* 520 F.3d 490, 495 n.3 (D.C. Cir. 2008)). *See* 1 LARSON ON EMPLOYMENT DISCRIMINATION § 8.04, at 8–81 to 8–82 (rev. ed. 2015) ("pretext can be shown by demonstrating . . . irregularities in . . . the procedures for discharge"). Pestana indicated that Plaintiff's reassignment was related to her conduct, not her performance (DSF ¶ 63.16; PSF ¶ 64), while D'Alessandro's April 15, 2015 e-mail message stated that Plaintiff's reassignment was related to her performance (DSF ¶ 63.18; Dkt. No. 90 Ex. EE). According to Romanosky, an employee who was disciplined for either her performance or conduct should have been given notice of the alleged misconduct, an opportunity to explain the reasons for the alleged misconduct, such as a medical condition, and counseling in ways in which to improve her performance or remedy the conduct at issue (Dkt. No. 89 at 115-21). These procedures were not followed prior to Plaintiff's reassignment.

Finally, Plaintiff cites the variance between the procedures afforded to a similarly situated nondisabled FAA manager, CS, who was reassigned, and the different treatment meted

out to her (Dkt. No. 89 at 55). *See Santiago–Ramos,* 217 F.3d at 55. An employee can demonstrate pretext by producing evidence that she was treated differently than other similarly situated [nondisabled] employees. *See Kosereis,* 331 F.3d at 214; *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 17 (1st Cir. 1994). "She must 'identify and relate specific instances where persons similarly situated 'in all relevant respects' were treated differently.'" *Griel,* 71 F. Supp. 2d at 11 (quoting *Dartmouth Review v. Dartmouth Coll.,* 889 F.2d 13, 19 (1st Cir. 1989), *overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández*, 367 F.3d 61 (1st Cir. 2004)). "In addition, she must identify these instances 'in terms of performance, qualifications and conduct, "without such differentiating or mitigating circumstances that would distinguish" their situations.'" *Id.* (quoting *Stratus Computer,* 40 F.3d at 17). *See Rodriguez– Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 21 (1st Cir. 1999). Plaintiff has sustained her burden.

Like Plaintiff, CS was a J-Band manager who allegedly was "not very good [at] collaborating" with others and was reassigned to another position (Dkt. No. 89 at 55, 59-60). CS's manager, Boudreau, notified CS in writing of the specific ways in which he failed to meet performance standards and CS had an opportunity to respond to the criticism (Dkt. No. 89 at 58). Using the performance standards as guidance, Boudreau crafted a plan for the ways in which CS could improve his job performance and provided coaching, training, and mentoring (Dkt. No. 89 at 56, 57, 58). When Boudreau determined that it was necessary to reassign CS, he informed CS of his decision and collaborated with him to find a suitable position (Dkt. No. 89 at 59-60). CS was reassigned to a nonsupervisory J-Band position, which Boudreau considered to be of "equal value" to his prior position (Dkt. No. 89 at 61). According to Boudreau, CS's reassignment did not carry a "negative connotation" (Dkt. No. 89 at 61-62).

In contrast, before Plaintiff's reassignment, she was never notified that her job performance fell short of expectations (DSF 20.1; PSF ¶ 61; Dkt. No. 89 at 80; Dkt. No. 89-4 at 10). She was not afforded opportunities to explain that her medical condition caused her behavior or to rectify her performance deficits (Dkt. No. 89 at 120-21). Pestana cited HRPM EMP-1.14 as controlling Plaintiff's reassignment (Dkt. No. 70-1 at 9; Dkt. No. 89 at 88). That policy indicated:

> When an administrative reassignment or relocation is *contemplated,* the employee must be fully informed of the reasons why the actions must be taken. The personal interests and desires of the employee shall be carefully considered, but the final decision on any such proposed action shall be decided according to the needs of FAA.

(Dkt. No. 70-16 at 6) (emphasis added). In contrast to CS, Plaintiff was not notified that her reassignment was being considered and she was not afforded an opportunity to weigh in (DSF ¶ 63.13; PSF ¶ 52; Dkt. No. 90 Ex. EE). In Plaintiff's view, unlike CS, her reassignment from a supervisory to a nonsupervisory position put her at a "significant" disadvantage for professional advancement (Dkt. No. 89-4 at 7).

Relying on *Ray,* 799 F.3d at 114-15, and *Rodriguez-Cuervos,* 181 F.3d at 21, Defendant argues that Plaintiff was not similarly situated to CS who "worked in a different department for a different manager" (Dkt. No. 97 at 4). However, in terms of comparative evidence, "similarity, rather than identicality, provides the essential requirement for an analogy." *Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 21-22 (1st Cir. 1999). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." *Dartmouth Review,* 889 F.2d at 19. Plaintiff has met that test. The fact that Plaintiff and CS had different positions and different direct supervisors is not sufficient to negate their similarities, particularly

because they were both managers in the Engine and Propeller Directorate who had difficulty communicating with colleagues and their situations were discussed in tandem by their managers, HR, and LR (Dkt. No. 89 Ex. EE). *See Ray,* 799 F.3d at 114 (legal associates who did not work in plaintiff's practice group could be used as comparators); *Anderson v. Brennan*, 219 F. Supp. 3d 252, 258 (D. Mass. 2016) ("this [c]ourt declines to adopt the Postal Service's position that another employee disciplined by a different supervisor cannot, as a categorical rule, be a comparator."). A reasonable factfinder could conclude that Plaintiff and CS were similarly situated and that Plaintiff was treated differently because she was disabled.

In view of the evidence of Plaintiff's satisfactory performance evaluations, Pestana's conflicting representations regarding the reasons for Plaintiff's reassignment, Defendant's failure to follow the established procedures, and the treatment of CS, Plaintiff has sustained her burden of pointing to evidence from which a factfinder could infer that she was reassigned because of an allegedly disabling condition.

> 2.    Plaintiff has failed to adduce sufficient evidence to support an inference that the failure to select her for other positions for which she applied was discriminatory.

Plaintiff further alleges that her disabilities motivated Stacy Ratliff to select other candidates for the Connecticut K-Band position and the management detail in the New York and New Jersey office. Defendant argues that Ratliff, the decision-maker, did not know of Plaintiff's disabilities in 2016 when she filled the positions and that she had nondiscriminatory reasons for not selecting Plaintiff that Plaintiff cannot show were pretextual. On these points, Defendant's argument is persuasive.

Plaintiff told Ratliff in 2011 that she suffered from depression (PSF ¶ 26; Dkt. No. 89 at 160). During Plaintiff's one-on-one interview with Ratliff for the Connecticut Supervisory ASI

position in 2016, Plaintiff mentioned that she had PTSD (Dkt. No. 89 at 157; Dkt. No. 71-1 at 2). However, Ratliff testified that she did not recall Plaintiff associating PTSD with her difficulty interacting with her peers and Plaintiff fails to offer contrary evidence (Dkt. No. 89 at 157). Telling a decision-maker of a medical condition is insufficient to prove knowledge of a disability. *See DiBlasi v. Liberty Mut. Grp. Inc.*, Civil Action No. 12-10967-RGS, 2014 WL 1331056, at *15 (D. Mass. Apr. 3, 2014) ("'[S]imply informing an employer of a particular condition is not tantamount to providing the employer with knowledge that the employee is substantially limited in some major life activity.'") (alteration in original) (quoting *Sever v. Henderson*, 381 F. Supp. 2d 405, 418 (M.D. Pa. 2005)).

Even if Ratliff knew Plaintiff had limitations when she did not select her for two supervisory positions, Plaintiff has failed to point to evidence from which a discriminatory motive could be inferred. Citing her education and score on the STAIRS interview, Plaintiff claims that she was more qualified than Murphy, the individual Ratliff selected for the Connecticut position.[18] "When an employer claims to have hired or promoted one person over another on the basis of qualifications, the question is not which of the aspirants was better qualified, but, rather, whether the employer's stated reasons for selecting one over the other were pretextual." *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004) (citing *Smith v. F.W.*

_____

[18] A STAIRS interview involved a structured and standardized assessment method designed to measure job related competencies of candidates by systematically inquiring about their behavior in past experiences and/or their behavior in hypothetical situations (DSF ¶ 130; PSF ¶ 116). STAIRS panel interviews are designed to ensure candidates have equal opportunities to provide information and are assessed accurately and consistently (PSF ¶ 117). The panelists rated the interviewees as "ineffective," "fair," "effective," "highly effective," or "outstanding" in the following areas: problem solving; building teamwork and cooperation; building alliances; interpersonal relationships and influence; vision; agility; innovation; customer focus; and oral communication (*see, e.g.,* Dkt. No. 89 Ex. X). Plaintiff was familiar with the STAIRS panel format from prior interviews (PSF ¶ 118).

*Morse & Co.,* 76 F.3d 413, 421 (1st Cir. 1996)). "This result follows from a form of the business judgment rule." *Id. See Mesnick,* 950 F.2d at 825 (explaining that "[c]ourts may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions"). "Qualifications are notoriously hard to judge and, in a disparate treatment case, more must be shown than that the employer made an unwise personnel decision by promoting 'X' ahead of 'Y.'" *Rathbun,* 361 F.3d at 74 (citing *Keyes v. Sec'y of Navy,* 853 F.2d 1016, 1024–26 (1st Cir. 1988); *Gray v. New Engl. Tel. & Tel. Co.,* 792 F.2d 251, 255 (1st Cir. 1986)). "In other words, subjective evidence of competing qualifications seldom provides a principled way for a factfinder to determine whether a given employment decision, even if wrong-headed, was anything more than 'a garden-variety mistake in corporate judgment.'" *Rathbun,* 361 F.3d at 74 (quoting *Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1341 (1st Cir. 1988)).

According to Ratliff, Murphy was the "best candidate" for the MIDO-41 position (Dkt. No. 71-1 at 9). She had worked in the aviation industry for thirty-eight years and at the FAA for twenty years, compared to Plaintiff's fifteen years in aviation and ten years at the FAA (Dkt. No. 71-1 at 8, 10). Although Plaintiff had higher scores on the STAIRS interview, that was only one factor in the selection process (Dkt. No. 71-1 at 8). *See Greene v. Walgreen E. Co.,* No. 16-2487, 2018 WL 8263947, at *4 (1st Cir. Nov. 15, 2018), *cert. denied,* 1139 S. Ct. 2030 (2019) (plaintiff's score on the math assessment was "a small fraction of the final composite score" and was insufficient to demonstrate pretext); *Clifford v. Barnhart,* 449 F.3d 276, 283 (1st Cir. 2006) ("Even if [plaintiff] was more qualified than the selectee[] in certain ways, SSA was entitled to assess each applicant and decide which applicant presented the best application as a whole. Although one applicant may have had impressive credentials in one specific area, he may have

turned out to be deficient in another area. It was SSA's prerogative to hire the applicant who presented the best combination of skills.").  In making her choice, Ratliff also considered the candidates' written responses to the Management Selection Factors, the one-on-one interviews, and feedback from the candidates' references (Dkt. No. 70-1 at 8).  For example, in contrast to Plaintiff who gave the same general response for all Management Selection Factors, Murphy gave "clear examples of employee and peer engagement" in her written responses (DSF ¶ 123; Dkt. No. 70-1 at 8-9).  Ratliff further indicated that Murphy surpassed Plaintiff in her degree of technical expertise, passion for aviation safety, and ability to command the respect of the office (Dkt. No. 70-1 at 8).  Plaintiff's belief that she was more qualified than Murphy, which is all that she offers, is insufficient to demonstrate pretext.  *See Dunn v. Trustees of Boston Univ.,* 761 F.3d 63, 73 (1st Cir. 2014) ("A plaintiff cannot make pretext a trial-worthy issue by 'essentially relying on his personal belief that he was more qualified' for a job that his employer gave to someone outside of the protected class.") (quoting *Vega–Colón v. Wyeth Pharms.,* 625 F.3d 22, 28 (1st Cir. 2010)).

Similarly, Plaintiff has failed to point to evidence showing that Ratliff's reason for selecting Macay for the detail position was pretextual.  Ratliff stated that she selected Macay instead of Plaintiff because detail positions were designed to give employees management experience and, unlike Plaintiff, Macay had not been a manager, a fact that is not in dispute (DSF ¶ 129).[19]  Plaintiff's belief that Ratliff's decision was unfair because it deprived her of the management experience that she was told she needed does not make it pretextual.  *Hawkins v. Mary Hitchcock Mem'l Hosp.*, 22 F. App'x 21, 22 (1st Cir. 2001) ("an employer can hire one

_____

[19] Plaintiff's first experience in management at the FAA was in a detail position in Burlington (DSF ¶ 6).

employee instead of another for any reason, fair or unfair, without running afoul of the anti-discrimination laws so long as the employer's stated reason is not pretextual and its choice is not driven by . . . some . . . protected characteristic.") (citing *F.W. Morse & Co.,* 76 F.3d at 422).[20]

In summary, Defendant's motion is denied as to so much of Count I as alleges that Plaintiff's reassignment to Connecticut was discriminatory. The motion is granted as to so much of Count I as alleges that the FAA discriminated against Plaintiff when she was not selected for the Connecticut and the New York and New Jersey positions.

B.      Count II:  Denial of Reasonable Accommodations

"Discrimination on the basis of disability includes 'not making reasonable accommodations to the known physical or mental limitations' of an employee, unless the employer can demonstrate that the accommodation would impose an undue hardship." *U.S. Equal Emp't Opportunity Comm'n v. Wal-Mart Stores, Inc.*, 1:18-cv-00170-JDL, 2019 WL 3805343, at *2 (D. Me. Aug. 13, 2019) (citing 42 U.S.C. § 12112(b)(5)(A)).

1.      Plaintiff failed to exhaust administrative remedies as to Pestana's alleged denial of a reasonable accommodation.

Plaintiff claims that Pestana's failure to grant her October 29, 2014 request for the purpose and structure accommodation constituted discrimination (Dkt. No. 1 ¶ 114(d), ¶ 117(a)). The record supports Defendant's position that Plaintiff cannot assert this claim because she failed to exhaust administrative remedies.

---

[20] Plaintiff asserts that Ratliff conspired with her supervisor, Pestana, to discriminate against Plaintiff by not selecting her for these positions. Plaintiff fails to cite evidence to support her contention that Ratliff and Pestana ever discussed the selections. Speculative assertions will not defeat summary judgment. *See Kouvchinov v. Parametric Tech. Corp.,* 537 F.3d 62, 66 (1st Cir. 2008) (a plaintiff "cannot rely exclusively on naked assertions, unsupported conclusions, or optimistic surmise . . . the evidence adduced on each of the elements of the asserted cause of action must be significantly probative.").

"[A] *federal employee* who brings an action under the Rehabilitation Act must exhaust administrative remedies before proceeding to court." *Bartlett v. Dep't of the Treasury*, 749 F.3d 1, 8 (1st Cir. 2014) (citing *Spence v. Straw*, 54 F.3d 196, 201 (3d Cir. 1995)). "The purpose of the requirement 'is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation.'" *Bangura*, 334 F. Supp. 3d at 456 (quoting *Fantini v. Salem State Coll.,* 557 F.3d 22, 26 (1st Cir. 2009)). "In filing a complaint in court, a plaintiff is limited to her original claims as well as those that 'come within the scope of the EEOC investigation which can reasonably be expected to grow out of the [original] charge of discrimination.'" *Id.* (alteration in original) (quoting *Fantini,* 557 F.3d at 27) (quotations and citations omitted). "In order to exhaust administrative remedies, an employee must contact an EEO counselor within forty-five days of the alleged discriminatory act to attempt an initial informal resolution of the matter." *Id.* (citing *Velazquez-Rivera v. Danzig*, 234 F.3d 790, 794 (1st Cir. 2000); 29 C.F.R. § 1614.105(a)(1)). "Failure to do so serves as a bar to bringing a claim in court." *Id.* (citing *Velazquez-Rivera*, 234 F.3d at 794).

The applicable limitations period begins to run when "an employee has a complete and present cause of action . . . ." *Maziarz v. Brennan*, Case No. 15-cv-30098-MAP, 2016 WL 7799647, at *4 (D. Mass. Aug. 3, 2016), *rec. dec. adopted,* C.A. NO. 15-30098-MAP, 2016 WL 5334463 (D. Mass. Sept. 22, 2016) (citing *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016)). "When a request for a reasonable accommodation is made, refusal of that request '"is a discrete discriminatory act triggering the statutory [or administrative] limitations period."'" *Id.* (alteration in original) (quoting *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 129 (1st Cir. 2009)). *See Hill v. Hampstead Lester Morton Court Partners LP*, 581 F. App'x 178, 180–81 (4th Cir. 2014) (per curiam) (applying those principles to a claim under the Rehabilitation Act). On October 29,

2014, Plaintiff requested an additional day of telework to attend medical appointments (DSF ¶ 35; PSF ¶¶ 33, 34). Plaintiff contends that she also requested the purpose and structure accommodation (Dkt. No. 89-4 at 5-6; Dkt. No. 89-5 at 2 ¶ 12). Although Pestana granted Plaintiff's request to increase her telework days, he allegedly dismissed the purpose and structure accommodation request, characterizing the issue as one of poor communication skills (Dkt. No. 89-5 at 2 ¶¶ 9-12). Consequently, the clock began to run on October 29, 2014 and Plaintiff was required to bring her denial claim to the attention of an EEO counselor by, at the latest, December 13, 2014, which is forty-five days after that date. *See Green,* 136 S. Ct. at 1774; *Bangura*, 334 F. Supp. 3d at 456. She did not do so.

Plaintiff argues that the EEO complaint she filed on May 10, 2015 encompassed the failure to accommodate claim because she did not abandon her purpose and structure accommodation request and she included her allegation about Pestana's response to the request in her May 10, 2015 hostile work environment complaint (Dkt. No 88 at 49-50).[21] However, the First Circuit held in *Tobin* that the continuing violation doctrine applies to hostile work environment claims, but does not apply to failure to accommodate claims. *Tobin*, 553 F.3d at 130-31. Plaintiff knew, in October 2014, that Pestana did not intend to grant her purpose and structure accommodation request. Moreover, Plaintiff fails to present evidence of any occasion after October 29, 2014 when she renewed her request for the purpose and structure accommodation before she filed her first complaint. *See id.* at 131 ("an employee who renews his request for particular accommodations may bring suit based on a new 'discrete act' of

---

[21] Plaintiff makes this claim despite her representation that she had "no significant contact" with Pestana from October 29, 2014 until their meeting on February 18, 2015 and had "very little contact" with him from February 18, 2015 until April 21, 2015 when he notified her of the reassignment (PSF ¶ 37; Dkt. No. 89-5 ¶ 13).

discrimination if the employer again denies his request.") (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002)).

>    2.    The FAA's response to Plaintiff's request for reasonable accommodations in Connecticut was not discriminatory.

Plaintiff further claims that an excessive delay in Warren's response to her request for accommodations in Connecticut constituted a "constructive denial" (Dkt. No. 1 ¶ 117(d), (e); Dkt. No. 88 at 52). The court is not persuaded. The record evidence shows that Plaintiff's disabilities were accommodated as soon as possible after her arrival in Connecticut and were fully accommodated in February 2016 by assigning her to the administrative position that she requested and by granting all of the other accommodations she sought.

Between May 3, 2015, when Plaintiff began working in the Senior ASI position to which she had been reassigned in Connecticut, and February 2016, when she was reassigned to the Certification Specialist position that she requested, Murphy and Warren responded immediately to her accommodation requests and Plaintiff proffers no evidence showing that she was required to perform any job functions that were contraindicated by her physical condition. Following a May 12, 2015 meeting when Plaintiff explained her physical limitations, Warren told her that she would not be assigned as the Principal Inspector on projects and Murphy would assist her in supporting the ASIs (Dkt. No. 89-15 at 2). Murphy assigned Plaintiff to work at facilities closer to her home in Western Massachusetts and to her office and assigned her more administrative work (DSF ¶ 81). When Plaintiff submitted documentation of her medical conditions on July 17, 2015 and requested six accommodations, Murphy, as the acting manager, immediately granted Plaintiff's thirty-day leave request (DSF ¶¶ 85, 86, 87; PSF ¶¶ 100, 101; Dkt. No. 69-1 at 2; Dkt. No. 80-4 at 16). On September 14, 2015, Warren notified Plaintiff that because the FAA could not provide an accommodation to her disabilities that would enable her to perform the essential

functions of a Senior ASI, a position she seemingly could not perform in view of its requirements and the restrictions she asserted she had, he would begin the job reassignment process by searching for a vacant funded position at the same or lower level as her current position and asked her to complete a questionnaire enabling him to reassign her (DSF ¶¶ 93, 94; PSF ¶¶ 102, 103). *See Feliciano v. Rhode Island,* 160 F.3d 780, 786 (1st Cir. 1998) (offering plaintiff the opportunity to transfer to a vacant position for which she was qualified was a reasonable accommodation); 42 U.S.C. § 12111(9)(B). When Plaintiff asked Warren to reconsider on September 28, 2015, she specifically requested assignment to the administrative position of Certification Specialist (DSF ¶ 95; PSF ¶ 105). Warren notified her on February 2, 2016, that she would be accommodated by reassignment to the Certification Specialist position when the position became available on March 4, 2016 and that she would be granted all of the other accommodations she had sought on July 17, 2015 (DSF ¶¶ 113-17; PSF ¶¶ 106, 107; Dkt. No. 80-4 at 47-49).

As a matter of law, notwithstanding some delay, Warren's reassignment of Plaintiff to the Certification Specialist position when it became available was not the denial of a reasonable accommodation. While there may be circumstances in which an "unreasonable delay may amount to a failure to provide reasonable accommodations," this is not one of them. *Valle-Arce v. P.R. Ports Auth.,* 651 F.3d 190, 200 (1st Cir. 2011). "Relevant 'factors to aid in determining whether a delay was reasonable or unreasonable . . . includ[e] the length of the delay, the reasons for the delay, whether the employee was offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith.'" *Mack v. Georgetown Univ.,* Case No. 15-cv-793(RMC/GMH), 2017 WL 4325596, at *15 (D.D.C. Aug. 4, 2017) (quoting *Elzeneiny v. Dist. of Columbia*, 125 F. Supp. 3d 18, 38 (D.D.C. 2015))

(internal quotation marks and citation omitted). "A relatively short delay of a few weeks (or even a few months) in approving a request typically does not support [a failure to accommodate] claim." *Marks v. Washington Wholesale Liquor Co. LLC*, 253 F. Supp. 3d 312, 324-25 (D.D.C. 2017) (collecting cases). The five month delay between the time Plaintiff requested the reassignment to the Certification Specialist position and her assignment was not unreasonable where the job did not become available until March 2016 and Plaintiff does not allege that she was required to perform physical functions precluded by her impairments while she awaited reassignment. *See Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (twenty month delay in reassignment of plaintiff was not unreasonable because defendant acted "reasonably and in good faith" by considering him for reassignment to an open position on a weekly basis, by keeping plaintiff on medical leave until he was reinstated, and by offering plaintiff a suitable position as soon as it became available); *Mack,* 2017 WL 4325596, at *15 (five month delay was not unreasonable); *cf. Murray v. Warren Pumps, LLC,* 821 F.3d 77, 86 (1st Cir. 2016) (employer, who satisfied the plaintiff's accommodation requests and did not push him to do tasks that he was physically unable to perform, was granted summary judgment on plaintiff's failure to accommodate claim).

Because Plaintiff's request for the purpose and structure accommodation is barred by her failure to exhaust administrative remedies and no reasonable factfinder could conclude that the employer responded other than reasonably to Plaintiff's accommodation request in Connecticut, Defendant is entitled to summary judgment on Count II.[22]

---

[22] Plaintiff also claims that her reassignment to Connecticut was a failure to accommodate her physical disabilities because she was not able to perform all the requirements of the Senior ASI position without accommodations (Dkt. No. 1 ¶ 117(b)). However, "[a]n employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee, and the request must be 'sufficiently direct and specific' to give the employer notice of the

C.        Count III:    Hostile Work Environment Claims

Plaintiff's hostile work environment claims are based on the alleged acts of Pestana and Warren (Dkt. No. 1 at 19-21).

To succeed on a hostile work environment claim, a plaintiff must provide sufficient evidence from which a reasonable factfinder could conclude that her workplace was "'permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment.'" *Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 61 (1st Cir. 2019) (quoting *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted)). *See Quiles-Quiles v. Henderson*, 439 F.3d 1, 7 (1st Cir. 2006). "'The offensive conduct, in other words, must be "[(1)] severe [or] pervasive enough to create an objectively hostile or abusive work environment and [(2)] subjectively perceived by the victim as abusive.'" *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 91 (1st Cir. 2018) (alterations in original) (quoting *Rivera–Rodríguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 24 (1st Cir. 2001), *abrogated on other grounds by Crowley v. L.L. Bean, Inc.,* 303 F.3d 387 (1st Cir. 2002)). "The court looks at all the circumstances, including, among other things, 'the frequency and severity of the discriminatory conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with [the employee's] work performance.'" *Bangura,* 334 F. Supp. 3d at 464 (quoting *Kosereis*, 331 F.3d at 216); *see also Harris*, 510 U.S. at 23. "In assessing these factors, [the court's] job boils down to 'distinguish[ing] between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment.'" *Rivera-Rivera,*

---

needed accommodation." *Tobin,* 553 F.3d at 129.  Plaintiff admits that she did not tell Pestana or any other supervisor that she did not believe she could perform the essential functions of the Senior ASI position before the reassignment took effect.  Further, it was a job she had previously performed.  Consequently, the court does not view her reassignment as an actionable reasonable accommodation claim.

898 F.3d at 91 (second alteration in original) (quoting *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005)). "'"Subject to some policing at the outer bounds," it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment.'" *Id.* (quoting *Marrero,* 304 F.3d at 18–19).

        1.     Plaintiff has sufficiently alleged that Pestana created a hostile work environment.

Plaintiff alleges that Pestana, her supervisor, created a hostile work environment that impacted her ability to work by deriding her mental impairments and her requests for assistance and by being "verbally and emotionally abusive" (Dkt. No. 1 ¶ 121(a)-(d)). Whether Pestana was "hostile, dismissive, and demeaning of her status as disabled" presents a genuine issue of material fact that precludes summary judgment (Dkt. No. 1 at 19 ¶ 121(b)). *See Vega-Colón*, 625 F.3d at 32 ("because the inquiry into the existence of a hostile work environment is fact specific, 'the determination is often reserved for a fact finder.'") (quoting *Pomales v. Cellulares Telefónica, Inc.,* 447 F.3d 79, 83 (1st Cir. 2006)).

Plaintiff's evidence shows that Pestana demanded that Plaintiff stop crying while discussing HM, a "difficult" employee (Dkt. No. 89-4 at 4). When Plaintiff explained that she was unable to control her crying because she suffered from depression and her symptoms were increasing with the stress of addressing HM's "complex situation" (Dkt. No. 80-2 at 130-32; Dkt. No. 89-4 at 4-5), Pestana responded, "'No [they're] not'" and called her "unprofessional" (Dkt. No. 89-4 at 4-5). Thereafter, Pestana repeatedly told Plaintiff that "depression isn't an excuse and [she] wasn't going to get away with that excuse forever and [she] just needed to take medication" (Dkt. No. 80-2 at 131, 133).

On October 29, 2014, when Plaintiff told Pestana that she had been diagnosed with PTSD and needed accommodations (Dkt. No. 89-4 at 3, 5-6, 15), Plaintiff alleges that Pestana responded by becoming angry, rolling his eyes, and saying, "'You tell me you're depressed, then anxiety, now PTSD, what is going to be next Angela? When does this end?'" (PSF ¶ 36; Dkt. No. 89-4 at 15). He told her she needed "'training'" to remedy her inability to get along with her colleagues and to effectively communicate (PSF ¶ 32; Dkt. No. 89-4 at 11, 17; Dkt. No. 89-5 at 2 ¶ 12). When Plaintiff requested a detail to another office or an assignment to a national team to relieve the anxiety she experienced when interacting with her colleagues, Pestana called her request "'ridiculous'" (PSF ¶ 79; Dkt. No. 89-4 at 6).

A reasonable factfinder could infer that this conduct by Pestana exacerbated Plaintiff's anxiety and further hampered her ability to collaborate with her peers. There is some evidence that Pestana discussed Plaintiff behind her back with her colleagues, then told her no one liked her and everyone complained about her (PSF ¶ 76; Dkt. No. 89-4 at 10-11 & n.7; Dkt. No. 90 at 4). She claims he did not permit her to discuss a topic at meetings unless she consulted him first, then criticized her lack of participation (Dkt. No. 89-4 at 17; Dkt. No. 90 at 4).

Contrary to Defendant's claims that Plaintiff has failed to proffer evidence that Pestana's alleged harassment interfered with her work performance, Plaintiff alleges that Pestana's conduct exacerbated her PTSD symptoms, particularly anxiety, thereby hampering her work performance by decreasing her ability to focus on her work and making it more difficult for her to communicate and interact with her peers (Dkt. No. 1 at 20 ¶ 127; Dkt. No. 89-4 at 16, 20-21). *See Harris,* 510 U.S. at 23. In any event, unreasonable interference with an employee's work performance is only one factor that a court considers when analyzing a hostile work environment claim. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88 (1998); *Harris,* 510 U.S. at 23.

A viable hostile work environment claim is based upon the cumulative impact of individual acts that singularly may not be actionable. *See Morgan*, 536 U.S. at 115–16; *O'Rourke v. City of Providence,* 235 F.3d 713, 729 (1st Cir. 2001); *Williams v. Gen. Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999) ("[T]he issue is not whether each incident of harassment *standing alone* is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case."). The cumulative impact of Pestana's negative words and demeanor, which were directed at Plaintiff's claimed impairments, creates a triable issue on the question of whether or not Pestana created a hostile work environment, particularly in view of Pestana's supervisory authority over Plaintiff. *See Faragher*, 524 U.S. at 802 ("a harassing supervisor is always assisted in his misconduct by the supervisory relationship.") (collecting cases); *Shanoff v. Ill. Dep't of Human Servs.*, 258 F.3d 696, 705 (7th Cir. 2001) ("She used her supervisory position to bully, intimidate and insult [plaintiff] because of his race and religion, which is the type of 'extreme' harassment that is the hallmark of a hostile environment claim."); *Notarnicola v. Johnson Controls, Inc.,* No. 12-11331, 2014 WL 1304591, at *9 (E.D. Mich. Mar. 28, 2014) (whether harassment of the disabled plaintiff, who was demeaned and insulted by his supervisors, was severe or pervasive presented a question of fact that precluded granting summary judgment for the employer).

> 2. Plaintiff has not shown that she was subjected to a hostile work environment after her reassignment to Connecticut.

Plaintiff points to two statements by Warren, widely separated in time, that she claims created a hostile work environment in Connecticut (Dkt. No. 1 ¶ 117(c)). Plaintiff alleges that Warren's first statement came at the May 12, 2015 meeting when he asked her if she had considered disability retirement (DSF ¶ 79; Dkt. No. 89-4 at 13-14; Dkt. No. 89-15 at 2; Dkt. No. 90 at 7-8). Warren made the second statement on September 14, 2015 when he notified her that,

consistent with FAA policy, she would be reassigned to a vacant funded position at the same or lower level as her current position and that she could be removed from service if she refused the reassignment (DSF ¶¶ 93, 94; PSF ¶¶ 102, 103).

Even viewed under the Plaintiff-favorable standard applied to summary judgment motions, Warren's two isolated statements are not the stuff of which a hostile work environment claim is crafted. *See Murray,* 821 F.3d at 87 (the "statement[] fit[s] into the category of isolated, stray remarks whose substance and frequency cannot provide adequate foundation for a hostile work environment claim."). The first remark, while perhaps inappropriate, was isolated. The second statement was informational and cannot reasonably be viewed as harassing. Further, Plaintiff has not presented evidence that Warren's demeanor or comments "unreasonably interfered" with her job performance. *Kosereis,* 331 F.3d at 216.

Accordingly, Defendant's motion for summary judgment is denied as to so much of Count III as alleges that Plaintiff experienced a hostile work environment while reporting to Pestana and is granted insofar as the claim rests on isolated comments by Warren.[23]

D.      Count IV:  Retaliation

Plaintiff alleges the following acts of retaliation:  (1) Pestana's failure to give her a favorable reference for the Orlando J-Band management position and Busto's resulting failure to interview her for the Orlando position; (2) Pestana's failure to select her for the J-Band position in Burlington; (3) Warren's plan to reassign her to a vacant position at the same or lower salary

---

[23] Plaintiff also complains that Warren's "excessive delay" in responding to her request for reconsideration of the denial of her accommodation requests created a hostile work environment (Dkt. No. 1 ¶ 121(g)).  As previously discussed, the delay in reassignment was not unreasonable and, thus, this contention adds nothing to Plaintiff's hostile work environment claim.

and his statement that she could be removed from federal service if she rejected a reassignment; and (4) Ratliff's failure to select her for two positions (Dkt. No. 1 ¶ 132).

Retaliation claims are also subject to the *McDonnell-Douglas* burden-shifting framework. *See Bangura,* 334 F. Supp. 3d at 465. "To establish a prima facie case of retaliation, a plaintiff must prove that: (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity." *Id.* (citing *Fantini,* 557 F.3d at 32). If a plaintiff proves a prima facie case of retaliation, the burden shifts to the defendant to "articulate a legitimate, non-retaliatory reason for its employment decision." *Calero-Cerezo,* 355 F.3d at 26. "If the defendant meets this burden, the plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." *Id.* (citing *St. Mary's Honor Ctr.,* 509 U.S. at 510-11). "On summary judgment, the need to order the presentation of proof is largely obviated, and a court may dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a factfinder as to pretext and discriminatory animus." *Fennell v. First Step Designs, Ltd.,* 83 F.3d 526, 535 (1st Cir. 1996).

1.    A factfinder could conclude that Pestana's unfavorable job reference for the Orlando position was motivated by retaliatory animus.

Plaintiff applied for the Orlando J-Band position on October 5, 2015, but was not selected for an interview by Robert Busto, the selecting official for the posted position (DSF ¶¶ 97, 98; PSF ¶ 109). Busto viewed Plaintiff's downgrade from a J-Band supervisory position to a non-supervisory position – a decision made by Pestana -- as a "potential red flag" concerning her suitability for the job (PSF ¶ 112; Dkt. No. 65-1 at 9; Dkt. No. 95 at 82). When he called Pestana to inquire about Plaintiff, Pestana's comments gave Busto the impression that Plaintiff "might be difficult to manage" (Dkt. No. 65-1 at 12). Busto indicated that his decision not to

interview Plaintiff was based, in part, on Pestana's unfavorable reference (Dkt. No. 65-1 at 12; Busto Transcript at page 33).

Plaintiff claims that Pestana gave her a negative reference in retaliation for her first complaint to the EEO. Defendant does not dispute the establishment of a prima facie case: that Plaintiff's first complaint to the EEO was a protected action; that Pestana's unfavorable reference was an adverse employment action; and that Pestana knew about Plaintiff's EEO complaint when he spoke to Busto, thereby allowing the inference that the unfavorable reference was causally connected to Plaintiff's protected activity. The question is whether Plaintiff has adduced sufficient evidence for a factfinder to infer that Pestana's unfavorable reference was retaliatory.

"'[V]ery unfavorable' opinion references can be actionable, and evidence of retaliatory intent can be circumstantial." *Ammons v. Brantley Cty. Bd. of Comm'rs*, 5:16-CV-78, 2017 WL 498718, at *3 (S.D. Ga. Feb. 6, 2017) (quoting *Castillo v. Roche Labs., Inc.*, 467 F. App'x 859, 863 (11th Cir. 2012) (per curiam)). Although Defendant argues that Pestana's comments to Busto were consistent with Plaintiff's evaluations (Dkt. No. 78 at 24), this reason is arguably inconsistent with the evidence that Plaintiff was never disciplined, or advised that she did not meet performance expectations, or placed on an ODP plan (DSF ¶ 14.3, 20.1, 48.2, 54.1; PSF ¶¶ 7, 61, 154; Dkt. No. 70-1 at 5, 6). Moreover, Pestana had reason to know that his criticisms in Plaintiff's evaluations were for conduct she had told him was caused, at least in part, by her impairments, including PTSD (Dkt. No. 89-4 at 5-6). A reasonable factfinder could infer that Pestana held a "vengeful grudge" against Plaintiff for filing an EEO complaint against him. *Palmquist v. Shinseki,* 689 F.3d 66, 71 (1st Cir. 2012). *See Abbott v. Crown Motor Co.,* 348 F.3d 537, 544 (6th Cir. 2003) (whether defendant would have given plaintiff an unfavorable job

recommendation had plaintiff not engaged in protected activity presented a genuine issue of material fact precluding summary judgment). Thus, the evidence presents a trial-worthy issue concerning Pestana's motive. *See Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998) ("trial courts 'should "use restraint in granting summary judgment" where discriminatory animus is in issue.'") (citation omitted).

Busto's non-selection of Plaintiff for an interview is a different story. Plaintiff fails to demonstrate that retaliation was the but-for cause of Busto's decision not to interview her. *See Palmquist,* 689 F.3d at 74. There is no evidence that Busto knew Plaintiff had lodged an EEO complaint when he made the employment decision (Dkt. No. 65-1 at 3). Thus, Plaintiff has not established a causal connection between Busto's decision and the protected activity. *See Montalvo-León v. Wyeth Pharms. Co.*, Civil No. 05-1236 (DRD), 2007 WL 2905350, at *25 (D.P.R. Sept. 24, 2007). In addition, Busto proffered nondiscriminatory reasons for preferring to interview candidates other than Plaintiff, including his experience working with some other candidates (Dkt. No. 65-1 at 6). Plaintiff has not pointed to evidence calling Busto's motivation into question. *See Bailey v. USX Corp.*, 850 F.2d 1506, 1508-09 (11th Cir. 1988) (concluding that plaintiff failed to establish a Title VII retaliation claim where he failed to prove that a prospective employer's failure to hire him was casually related to a negative reference by his former employer).

2. Plaintiff has raised a question of material fact as to whether Pestana's failure to select Plaintiff for the Burlington J-Band position was retaliatory.

Defendant has pointed to credible evidence that Pestana had legitimate, nondiscriminatory reasons for selecting Michael Chagnon for the J-Band position that Plaintiff previously held (DSF ¶ 109). Under the circumstances of this case, however, where the court

has concluded that a reasonable factfinder could question Pestana's motives in his decisions about Plaintiff, the court is reluctant to conclude, as a matter of law, that he had no retaliatory motive when he refused to re-hire Plaintiff. According to Pestana, he selected Chagnon, who scored one point higher than Plaintiff on the STAIRS interview panel's cumulative rating, because he was the "best qualified candidate" (Dkt. No. 70 at 6 ¶ 39). Pestana indicated that Chagnon did an "outstanding job" when he replaced Plaintiff as a Supervisory ASI for six months and gave examples of the ways in which he effectively managed the office, supported the Directorate, and interacted and collaborated with the MIO manager, MIDO MT, and DMT (Dkt. No. 70 at 6-7 ¶ 39). *See Dickinson v. UMass Mem'l Med. Grp.*, Civil Action No. 09-40149-FDS, 2011 WL 1155497, at *15 (D. Mass. Mar. 24, 2011) ("Hiring the most qualified person to a position is . . . a legitimate and non-retaliatory reason for declining to interview and promote plaintiff.") (citing *Gu v. Boston Police Dep't.,* 312 F.3d 6, 12 (1st Cir. 2002)). Plaintiff's claim that Pestana's proffered reasons were pretextual because she was more qualified might, in other circumstances, fail to carry the day (PSF ¶¶ 119, 120, 121).

Nonetheless, while recognizing that "it is not the role of the court 'to second-guess the business decisions of an employer, imposing our subjective judgments of which person would best fulfill the responsibilities of a certain job,'" *Clifford*, 449 F.3d at 283 (quoting *Rossy v. Roche Prods., Inc.,* 880 F.2d 621, 625 (1st Cir. 1989)), and that Pestana was placed in a difficult position when forced to choose between Chagnon and Plaintiff, with whom he had a contentious history while he was her direct supervisor in Burlington, it is also the case that the First Circuit has advised courts to be "'particularly cautious' about taking questions [of pretext] out of the jury's hands." *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 40 (1st Cir. 2003) (quoting *Hodgens,* 144 F.3d at 167). Inasmuch as Pestana's unfavorable recommendation to Busto and his

subsequent refusal to re-hire Plaintiff could be viewed as a pattern of retaliation, the question of

Pestana's motive is one that warrants presentation to a factfinder. *See Marx v. Schnuck Mkts,*

*Inc.*, 76 F.3d 324, 329 (10th Cir. 1996) ("Granting plaintiff the benefit of every favorable

inference, the pattern of [retaliatory] actions taken by defendant precludes summary judgment

concerning defendant's motivation in demoting plaintiff and terminating his employment."); *Jay*

*Edwards, Inc. v. New Eng. Toyota Distrib., Inc.*, 708 F.2d 814, 824 (1st Cir. 1983) ("a pattern of

retaliatory practices . . . was probative of [defendant's] motive and intent"); *Finnegan v. CSX*

*Transp., Inc.*, 368 F. Supp. 3d 263, 291 (D. Mass. 2019) (denying defendant's motion for

summary judgment where there were disputed issues of material fact; notwithstanding plaintiff's

"scant" evidence of retaliation, defendant did not meet its burden to establish that it had a

legitimate reason not to hire plaintiff that was not related to his protected activity).

> 3.  No reasonable finder of fact could conclude that Warren's statement that
>     Plaintiff would be reassigned to a vacant position at the same or lower
>     salary and that she could be removed from federal service if she did not
>     accept a reassignment was retaliatory.

Plaintiff cannot establish the elements of a prima facie case based on Warren's actions

because this conduct did not constitute an adverse employment action. *See Fantini,* 557 F.3d at

32. "The term 'adverse employment action' arose in the Title VII context as a shorthand for the

statutory requirement that a plaintiff show an alteration in the material terms or conditions of his

employment." *Bergeron v. Cabral,* 560 F.3d 1, 7–8 (1st Cir. 2009), *abrogated on other grounds*

*by Maldonado v. Fontanes,* 568 F.3d 263 (1st Cir. 2009) (internal citations omitted). To

establish a successful retaliation claim, "a plaintiff must show that a reasonable employee would

have found the challenged action materially adverse, 'which in this context means it well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"

*Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales,*

438 F.3d 1211, 1219 (D.D.C. 2006)). "The alleged retaliatory action must be material, producing a significant, not trivial, harm." *Carmona–Rivera v. Puerto Rico,* 464 F.3d 14, 20 (1st Cir. 2006).

Warren was required to respond to Plaintiff's request for reasonable accommodations and, so far as appears from the record, he did so in compliance with FAA policy (DSF ¶¶ 93, 94; PSF ¶¶ 102, 103). *See Norden v. Samper*, 503 F. Supp. 2d 130, 162 (D.D.C. 2007); 29 C.F.R. § 1614.203(d)(3)(i)(B). Plaintiff was reassigned to the position she requested, was granted the other accommodations she sought, and was not offered a vacant position in another location, demoted, or separated from federal service (Dkt. No. 80-4 at 39-41, 45-49). Any delay in completing the accommodation process was reasonable in the circumstances. Plaintiff has failed to show that she suffered the "significant, not trivial" harm necessary to prove an adverse employment action. *Carmona-Rivera,* 464 F.3d at 20. *See Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 67 ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

4.      Ratliff's failure to select Plaintiff for the Connecticut K-Band position or the New York and New Jersey detail position was not discriminatory.

Finally, Plaintiff's allegation -- that Ratliff was influenced by the retaliatory animus of Pestana, her supervisor, when she failed to hire Plaintiff for the Connecticut K-Band position and the New York and New Jersey detail position – is not supported by any evidence in the voluminous record submitted to this court (Dkt. No. 88 at 55-56).

"[T]he employee must show that the retaliator knew about her protected activity — after all, one cannot have been motivated to retaliate by something he was unaware of." *Medina-Rivera v. MVM, Inc.*, 713 F.3d 132, 139 (1st Cir. 2013). *See Pomales*, 447 F.3d at 85 ("there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she

decided to take the adverse employment action.").  Ratliff stated that she did not have knowledge of Plaintiff's engagement in protected activity when she filled the Connecticut and New York and New Jersey positions in May 2016 (DSF ¶¶ 91, 92, 105, 107, 111, 119, 128, 129; PSF ¶¶ 127, 128, 130, 136; Dkt. No. 71-1 at 2; Dkt. No. 89-5 ¶ 25; Dkt. No. 89-18 at 16).  Plaintiff appears to argue that Ratliff must have known about Plaintiff's EEO complaints because Pestana, her first level supervisor knew (PSF ¶ 129).  Plaintiff "cannot rely 'merely upon conclusory allegations, improbable inferences, and unsupported speculation'" to establish knowledge of the protected conduct.  *Pina v. Children's Place,* 740 F.3d 785, 796 (1st Cir. 2014) (quoting *Dennis v. Osram Sylvania, Inc.*, 549 F.3d 851, 855–56 (1st Cir. 2008)).  "In the absence of any evidence that [Ratliff] . . . had knowledge of [Plaintiff's] protected activity, her retaliatory failure to hire claim fails."  *Id.*

In summary, Defendant's motion for summary judgment is denied as to so much of Count IV as alleges retaliation by Pestana for his unfavorable job recommendation and for failing to hire Plaintiff for the Burlington position.  Defendant's motion for summary judgment is allowed as to Plaintiff's remaining contentions offered to support her retaliation claims in Count IV.[24]

E.    Damages

---

[24] To the extent Plaintiff alleges that her April 2015 reassignment to Connecticut was retaliatory, Plaintiff fails to demonstrate a causal connection between her request for accommodations on October 29, 2014 and Pestana's alleged retaliatory activities six months later (DSF ¶ 51; PSF ¶¶ 33, 39).  Although "[t]emporal proximity can create an inference of causation in the proper case," *Pomales,* 447 F.3d at 85, "[t]he Supreme Court has stated that '[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close."'"  *Calero-Cerezo,* 355 F.3d at 25 (second alteration in original) (quoting *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001)).  Where "three or four month periods have been held insufficient to establish a causal connection based on temporal proximity," a six month lapse does not support causation. *Id.*

Defendant argues that she is entitled to summary judgment because Plaintiff has not shown that she suffered any "direct economic loss as a result of the challenged actions" (Dkt. No. 97 at 9-10). If Plaintiff prevails on her discrimination or retaliation claims, she will, at the very least, be entitled to recover for emotional distress. *See Huertas Leon v. Colon-Rondon,* 376 F. Supp. 3d 167, 182 (D.P.R. 2019) (citing *Panzardi-Santiago v. Univ. of P. R.*, 200 F. Supp. 2d 1, 20-21 (D.P.R. 2002)); *Vazquez v. Municipality of Juncos,* 756 F. Supp. 2d 154, 167 (D.P.R. 2010). Thus, a lack of direct economic loss cannot support entry of judgment in Defendant's favor. The court reserves for the time of trial questions about the admissibility of evidence related to any losses claimed by Plaintiff.

V.    <u>CONCLUSION</u>

For the above-stated reasons, Defendant's Motion for Summary Judgment (Dkt. No. 75) is DENIED as to:

    (1)    So much of Count I as alleges disability discrimination based on Plaintiff's reassignment to Connecticut in April 2015;

    (2)    So much of Count III as alleges that Plaintiff experienced a hostile work environment while working at MIDO-42;

    (3)    So much of Count IV as alleges that Pestana retaliated against Plaintiff by giving her an unfavorable job recommendation for the Orlando position; and

    (4)    So much of Count IV as alleges that Pestana retaliated against Plaintiff in February 2016 by not hiring her for her former J-Band job in Burlington.

Defendant's motion is ALLOWED as to:

    (1)    So much of Count I as alleges disability discrimination based on Plaintiff's nonselection for the Connecticut J-Band position and the New York and New Jersey detail position;

    (2)    All of Count II;

(3)     So much of Count III as alleges that Plaintiff experienced a hostile work environment at MIDO-41 in Connecticut after May 3, 2015;

(4)     So much of Count IV as alleges that Busto's nonselection of Plaintiff for the Orlando J-Band position was retaliatory, and that Warren and Ratliff retaliated against Plaintiff.

The clerk is directed to set a date for an initial pre-trial conference.

It is so ordered.

Date:  September 30, 2019                            /s/ Katherine A. Robertson____
                                                    KATHERINE A. ROBERTSON
                                                    United States Magistrate Judge